[Civ. No. 44881. Second Dist., Div. Three. Jan. 3, 1975.]

PHILIP P. QUATTRONE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
WHITTAKER CORPORATION, Real Party in Interest.

298

**COUNSEL**

Sedgwick, Detert, Moran & Arnold and Stephen Jones for Petitioner.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Wesley G. Howell, Jr., Roy G. Spece, Jr., and Ronald K. Fujikawa for Real Party in Interest.

**OPINION**

**POTTER, J.**—This is a petition for writ of mandate pursuant to Code of Civil Procedure section 418.10, subdivision (c), to review respondent court's denial of a motion to quash service of summons made by mail on a Pennsylvania resident. In its complaint for damages, real party in interest, Whittaker Corporation (hereinafter "Plaintiff"), a California corporation with its principal office in Los Angeles, alleged a conspiracy among petitioner Philip P. Quattrone (hereinafter "Defendant"), three other named conspirators and numerous Does to defraud Plaintiff by submitting to it falsified financial records relating to the operations of Crown Aluminum Industries Corp. (hereinafter "Crown"), a Pennsylvania-based subsidiary of Plaintiff. Crown, acquired by Plaintiff in 1967 under an "Acquisition Agreement and Plan of Reorganization," had continued to operate under its existing management pursuant to a supplemental agreement covering "Conduct of Business After Closing."

The acquisition agreement provided for the exchange of Crown shares for shares of Plaintiff issued for such purpose under either of two options at the election of the Crown shareholders. One option under which 12.1 shares of Crown were exchanged for 1 share of Plaintiff included participation in a "Reserve Stock A Performance Program" under which additional shares of Plaintiff's stock would be issued by Plaintiff, based upon the profit performance of Crown during a two-year period following closing. Fraudulent financial records of Crown's operations allegedly supplied to Plaintiff by the conspirators caused it to issue 18,607 shares of its common stock in 1969 which were not properly issuable in view of the true profit experienced by Crown.

Other injury allegedly incurred by Plaintiff as a result of the conspiracy and the continued submission of false financial information through 1972 included that resulting from contribution of additional capital based upon assumed earning capacity and loss of a beneficial contract to sell Crown when the true facts were discovered, bringing the total damage alleged to $11,000,000.

The other named defendants answered; Defendant made a timely motion under Code of Civil Procedure section 418.10 to quash service of summons on the ground of lack of jurisdiction of the court over him, and to dismiss the action on the ground of inconvenient forum.

In support of the motions, Defendant filed his affidavit comprising two pages. This affidavit stated that from August 1, 1963 to February 1, 1972, Defendant worked for Crown in Pittsburgh, Pennsylvania, and lived in that area, and that his only activities outside Pennsylvania were occasional visits to the company's plant in Roxboro, North Carolina. Defendant further averred that after the acquisition agreement went into effect, he was "asked to be acting controller of Crown" but was never asked to be or elected an officer either of Crown or of Plaintiff. Defendant stated his present employment was in a small accounting business in Pennsylvania, where he remained a registered voter. He denied (1) doing any business in the State of California, (2) receiving any income from California corporations or businesses, and (3) having solicited any clients in California.

In response to Defendant's motion, Plaintiff submitted two declarations. The declaration of Albert A. Murphy, who made an operational audit of Crown in 1972, detailed an interview with Defendant in which Defendant allegedly said that he had been responsible for the prepara-

tion of financial reports relating to Crown from 1968 to 1972, and that he had participated in the preparation and submission of deceptive financial reports designed to "cover" inventory shortages apparent from Crown's primary records in 1969, 1970 and 1971. The other declaration was that of Harry S. Derbyshire, Plaintiff's senior vice-president and, since 1967, chief financial officer. It explained Defendant's relationship to the so-called "Reserve Stock A Performance Program" under the acquisition agreement. Derbyshire stated that Defendant was one of the former Crown shareholders who elected to participate in said program and thereby to receive additional reserve shares based upon the profitability of Crown for the two fiscal years ending October 31, 1969. He further stated that "[i]n direct reliance upon the fraudulent financial information prepared by Crown employees, Whittaker issued 27,663 'reserve' shares to participating shareholders," that "[h]ad the true results of Crown's operation been reported, only 9,056 'reserve' shares would have been issued," and that the market value of Plaintiff's stock in 1969 was $24.875 per share. Derbyshire's declaration also averred in general terms that Plaintiff infused additional capital into Crown's operations on the basis of the false financial reporting and that a 1972 proposed sale of Crown's assets and business to a third party was rescinded by such third party when a Price Waterhouse audit disclosed an inventory shortage of approximately $6,000,000 (excess of book inventory over physical inventory).

Defendant's motions to quash and to dismiss were heard on August 21, 1974, and on that date both motions were denied. Notice of entry of said order was waived. Thereafter, on September 4, 1974, Defendant filed with this court his petition for writ of mandate. This was one day beyond the 10-day period within which Defendant was permitted to petition this court for a writ of mandate. (Code Civ. Proc., § 418.10, subd. (b).) The last day for filing was Tuesday, September 3, 1974, inasmuch as the tenth day fell on Saturday, August 31, 1974, and Monday was Labor Day. An examination of the superior court file reveals that no extension was granted by that court.[1] In the absence of knowledge of this fact, the clerk of this court filed the petition and this court granted the alternative writ. When the superior court file revealed the absence of an extension, this court informed Defendant that a showing under Code of Civil Procedure section 473 was required, establishing that the late filing was the result of inadvertence or excusable neglect.

---

[1]Pursuant to rule 12, subdivision (a) of the California Rules of Court, this court has had this file included in the record on appeal.

The declaration of counsel for Defendant was thereafter filed and stated that the petition was mailed for filing from San Francisco, California, on Friday, August 30, 1974, and that counsel, on the basis of prior experience in mailing matters between San Francisco and Los Angeles, believed it was reasonable to expect that it would arrive and be filed not later than Tuesday, September 3d. Counsel's declaration further stated that if this court had declined to file the petition or had summarily denied the application on the ground of late filing, he would have petitioned the superior court for an extension.

■ Under such circumstances, this court is authorized to grant relief from default under equitable principles or under section 473 of the Code of Civil Procedure. (*Cornell University Medical College* v. *Superior Court*, 38 Cal.App.3d 311, 315 [113 Cal.Rptr. 291].)

We are not disposed to affirm the reasonableness of counsel's assumption that mail posted in San Francisco on Friday will be delivered in Los Angeles the first business day of the following week. However, under the particular circumstances of this case, we believe Defendant is entitled to have his jurisdictional objection considered on the merits. As pointed out in *Cornell, supra,* at page 314, if Defendant's petition had been promptly denied by this court because of late filing, he could have sought an extension of time from the superior court. By the time attention was called to the late filing, the period within which such extension could have been granted had expired. Accordingly, relief will be granted from the default, and Defendant's petition will be considered on its merits.

In his memorandum of points and authorities in support of the petition, Defendant relies exclusively upon the proposition that he is not amenable to the jurisdiction of the California court because, in the absence of the required minimum contact between him and this state, maintenance of the suit would offend traditional notions of fair play and substantial justice. He has not attempted to argue that the court abused its discretion in failing to dismiss on the ground of inconvenient forum.[2]

---

[2]It is assumed that this ground for dismissal was abandoned in light of Plaintiff's citation in the trial court of *Thomson* v. *Continental Ins. Co.,* 66 Cal.2d 738, 742-743, 744-745 [59 Cal.Rptr. 101, 427 P.2d 765]; *Hadler* v. *Western Greyhound Racing Circuit,* 34 Cal.App.3d 1, 5-6 [109 Cal.Rptr. 502]; and *Ferreira* v. *Ferreira,* 9 Cal.3d 824, 838-839 [109 Cal.Rptr. 80, 512 P.2d 304], imposing a heavy burden upon Defendant moving on such grounds where Plaintiff is a California resident.

The controlling issue in this proceeding is, therefore, the propriety of the superior court's order denying the motion to quash the service of summons.

Section 410.10 of the Code of Civil Procedure provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." By imposing no limitation except those imposed by constitutional considerations, this section authorizes the broadest possible exercise of judicial jurisdiction. In its 1969 Annual Report to the Governor and the Legislature, the Judicial Council of California commented at length upon the effect of Code of Civil Procedure section 410.10. Its comment in that respect is reprinted as an annotation to Code of Civil Procedure section 410.10 in West's Annotated California Codes. The Judicial Council comment on said section states: "All the recognized bases of judicial jurisdiction are included. In the case of natural persons, such bases currently include presence, domicil, residence, citizenship, consent, appearance, doing business in a state, doing an act in a state, causing an effect in a state by an act or omission elsewhere, ownership, use or possession of a thing in a state, as well as other relationships to a state."

The general principles governing determinations under this section are stated in said comment as follows: "Judicial jurisdiction in its broadest sense is the power of a state, through any of its courts or, on occasion, through its legislative, executive or administrative bodies, to create legal interests which will be recognized and enforced in all the states. [Citations.] Within a state's boundaries, this power is plenary, except as may be delegated to the federal government by the Constitution of the United States. [Citations.] Outside the state, such power is limited to instances in which 'a defendant . . . [has] certain minimum contacts with [the state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' [Citations.]

"The sufficiency of such contacts is a matter of constitutional law on which the Supreme Court of the United States has the final voice. A judgment rendered in the absence of such contracts [sic] violates the due process clause of the Fourteenth Amendment, and is subject to collateral attack in the state where rendered and elsewhere."

Eleven different "Bases of Judicial Jurisdiction over Individuals" are stated in the comment. These include:

"(1) Presence
"(2) Domicil
"(3) Residence
"(4) Citizenship
"(5) Consent
"(6) Appearance
"(7) Doing Business in State
"(8) Doing an Act in State
"(9) Causing Effect in State by Act or Omission Elsewhere
"(10) Ownership, Use or Possession of Thing in State
"(11) Other Relationships"

It is immediately apparent that none of these 11 bases has any application to Defendant except No. (9); that is, "Causing Effect in State by Act or Omission Elsewhere." Defendant has no presence here; he is domiciled, resides and has citizenship in Pennsylvania; he has not consented or appeared in California; he is not doing business here; and he has not in the past done any act in this state or used things in this state.

The Judicial Council's comment includes a detailed discussion of basis No. (9), the pertinent portion of which is as follows: "A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an omission or act done elsewhere with respect to causes of action arising from these effects, unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable. . . . When jurisdiction over an individual is based solely upon such act or omission, only a claim for relief arising from such act or omission may be asserted against the individual. *(Ibid.)*

"As stated in RESTATEMENT (SECOND), § 37, Comment a:

" 'A state has a natural interest in the effects of an act within its territory even though the act itself was done elsewhere. The state may exercise judicial jurisdiction on the basis of such effects over the individual who did the act, or who caused the act to be done, provided that the nature of these effects and of the individual's relationship to the state are such as to make the exercise of jurisdiction fair to the individual

and reasonable from the standpoint of the international and interstate systems. . . .'

"There are three possible situations: (1) the act was done with the intention of causing effects in the state; (2) the act, although not done with the intention of causing effects in the state, could reasonably have been expected to do so; and (3) the act was not done with the intention of causing effects in the state and could not reasonably have been expected to do so. These three situations will be discussed in the order stated.

"The act may have been done with the intention of causing effects in the state. If so, the state may exercise the same judicial jurisdiction over the actor, or over the one who caused the act to be done, as to causes of action arising from these effects as it could have exercised if these effects had resulted from an act done within its territory. . . . So one who intentionally shoots a bullet into a state is as subject to the judicial jurisdiction of the state as to causes of action arising from the effects of the shot as if he had actually fired the bullet in the state. Similarly, an insurance company which solicits through the mails the purchase of an insurance policy and thereafter mails the insured premium notices and the like is as subject to the judicial jurisdiction of the state as to causes of action arising from the policy as if it had sent an agent into the state to solicit the policy and to present the premium notices to the insured. [McGee v. International Life Insurance Co., *supra*; *cf.* Travelers Health Association v. Virginia, *supra.*]"

It is apparent from the matters set forth in the declarations filed in behalf of Plaintiff that an adequate factual basis has been shown for the trial court to determine that Defendant had done an act outside the State of California with the intention of causing an effect within this state. Those facts included (a) Defendant's status as a former shareholder of Crown who elected to participate in the "Reserve Stock A Performance Program," (b) the provisions of the program as a result of which the number of additional shares to be issued by Plaintiff, a California corporation whose principal place of business was in the County of Los Angeles, was determined on the basis of the financial records of Crown evidencing its profit and loss position for the period between October 30, 1967 and November 2, 1969, and (c) the evidence of Defendant's admission (which Defendant did not contradict) that, as Crown's controller, he participated in the submission to Plaintiff of fraudulent financial data, the obvious effect of which would be to inflate the profits and thereby cause the issuance of additional shares to him. The

submission of such financial data to Plaintiff by Defendant, when he had such a direct interest in the matter, gives rise to a strong inference that he intended it to have the effect which it produced.

The Judicial Council comment suggests that in the case of such intentional causation of local effects, a claim for relief arising from such effects may be adjudicated as against the individual whose acts done outside the state have had such effect. There remains, however, the caveat expressed in said comment to the effect that the exercise of judicial jurisdiction is justified "unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." Cited as authority for this caveat are *Hanson* v. *Denckla* (1958) 357 U.S. 235 [2 L.Ed.2d 1283, 78 S.Ct. 1228]; and *McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199]. The reference to "the nature of the effects" produced within the forum state is based upon the opinion in *McGee*. In that case, California's exercise of judicial jurisdiction over an out-of-state insurance company which had solicited "reinsurance" from California residents and had received premiums from California (without ever being present in this state) was upheld. In support of the propriety of the exercise of jurisdiction under such circumstances, the Court said: "The California court based its jurisdiction on a state statute which subjects foreign corporations to suit in California on insurance contracts with residents of that State even though such corporations cannot be served with process within its borders.[1]

". . . . . . . . . . . . . . .

". . . It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." (355 U.S. at pp. 221, 223 [2 L.Ed.2d at pp. 225-226].)

In its later decision in *Hanson* v. *Denckla, supra,* 357 U.S. at page 252 [2 L.Ed.2d at page 1297], the Supreme Court, in distinguishing the factual situation in *McGee,* said: "This case is also different from *McGee* in that there the State had enacted special legislation (Unauthorized Insurers Process Act) to exercise what *McGee* called its 'manifest interest' in providing effective redress for citizens who had been injured by nonresidents engaged in an activity that the State treats as exceptional and subjects to special regulation.". Taken together, these opinions

---

"[1]Cal. Insurance Code, 1953, §§ 1610-1620."

indicate that where the forum state has manifested a special interest in controlling the effects by enacting special legislation with respect thereto, the exercise of jurisdiction based upon such effects is justified.

The Judicial Council's reference to the "nature . . . of the individual's relationship to the state" is based upon the Supreme Court's opinion in *Hanson.* In that case the Court spoke generally on the subject of the relationship required to make exercise of jurisdiction over a defendant reasonable. It said (357 U.S. at p. 253 [2 L.Ed.2d at p. 1298]): "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, *thus invoking the benefits and protections of its laws.*" (Italics added.)

■ From *McGee* and *Hanson* we conclude that it is reasonable to exercise jurisdiction on the basis of the defendant intentionally causing "effects in the state by an omission or act done elsewhere" whenever (a) the effects are of a nature "that the State treats as exceptional and subjects to special regulation," or (b) the defendant has, in connection with his causing such effects in the forum state, invoked "the benefits and protections of its laws."

■ Applying this standard, the facts of this case clearly establish the propriety of the exercise of jurisdiction by the California court. The effect which Defendant's allegedly conspiratorial conduct was designed to produce, to wit, the issuance of additional shares of stock by a California corporation, was a matter which this state treated "as exceptional and subject[ed] to special regulation." The acquisition agreement recited that the entire transaction, and the issuance of any of Plaintiff's shares pursuant thereto, were the subject of a negotiating permit from the California Commissioner of Corporations which required a further permit for the issuance of such shares. At the time of said transaction, the provisions of the Corporate Securities Law of California (Corp. Code, § 25000 et seq.)[3] required a permit for the issuance of any shares pursuant to the acquisition agreement. Section 25500 required a permit for the sale of shares of its own issue by any corporation; section 25009 defined "sale" as including an exchange. The

---

[3]All references herein to sections of the Corporations Code are to those sections as they read prior to January 2, 1969.

issuance of such a permit was conditioned upon the Commissioner of Corporations finding that the terms of the exchange were "fair, just, and equitable" both to the shareholders of the issuing corporation and to those of the acquired corporation. (Corp. Code, §§ 25507, 25510.) Any permit issued was required to specify the amounts of securities, the considerations, and the terms and conditions of issuance. (Corp. Code, § 25507.) The issuance of securities in "nonconformity" with the permit was a public offense (Corp. Code, § 26104), and securities so issued were rendered void (Corp. Code, § 26100).

These provisions of California law clearly indicated a strong state policy to protect the shareholders of a California corporation against unfair transactions adversely affecting their interest as investors. It is apparent that the showing made by Plaintiff was that one of the effects of Defendant's conduct, in falsifying the records as to the profits of Crown, was a violation of the terms of the permit which authorized the issuance of shares only in accordance with the provisions of the "Reserve Stock A Performance Program." The nature of the effect of petitioner's out-of-state conduct was, therefore, a violation of a special regulation of this state designed in part for the protection of the shareholders of California corporations.

An equally significant aspect of this state's policy, however, with respect to the issuance of shares by California corporations requiring a permit from the Commissioner of Corporations was the protection the permit procedure afforded the recipients of such shares in any exchange transaction. The finding required for the issuance of the permit referred to in the acquisition agreement included a finding that the transaction was fair and equitable to the shareholders of Crown who might elect to participate in such "Reserve Stock A Performance Program." Consequently, by electing to participate in such plan, Defendant invoked "the benefits and protections" of the laws of California. Those benefits and protections included the requirement that in order to obtain a permit for such transaction Plaintiff was required to establish that it was fair and equitable to Defendant and the other shareholders of Crown, and further was required to abide by the terms of said permit in the issuance of said shares.

We rest our decision upholding the exercise of jurisdiction by the California courts over Defendant upon the above principles and analysis of the facts because there is no decision of an appellate court in California involving any comparable factual situation. None of the

authorities relied upon by Defendant dealt with a comparable factual situation. *Sheard* v. *Superior Court*, 40 Cal.App.3d 207 [114 Cal.Rptr. 743], and *Arnesen* v. *Raymond Lee Organization, Inc.*, 31 Cal.App.3d 991 [107 Cal.Rptr. 744], held that jurisdiction could not be asserted over nonresident individuals solely by virtue of their relationship to a foreign corporation engaged in conduct subjecting it to the jurisdiction of the California courts (in the absence of a showing of an *alter ego* relationship), where the individual defendant's "sole business activity was as an employee or officer of the corporation." Jurisdiction over Defendant in this case, however, does not depend upon Crown doing business in this state and, in any event, Defendant's conduct complained of was committed in behalf of himself and his co-conspirators, not in behalf of Crown, which could not have benefited by it.

*Cornell University Medical College* v. *Superior Court, supra,* 38 Cal.App.3d 311, is likewise inapposite. There was no claim in that case of jurisdiction based upon the assertion that the defendant's out-of-state conduct created effects within California; it was simply claimed it was doing business here.

The only recent decision of our Supreme Court discussing the parameters of "the full power of the state, consistent with the due process clause" to subject defendants who are not present in the state to the jurisdiction of its courts is *Buckeye Boiler Co.* v. *Superior Court,* 71 Cal.2d 893 [80 Cal.Rptr. 113, 458 P.2d 57]. That case concerned service upon a foreign corporation pursuant to Code of Civil Procedure section 411, subdivision 2, before its repeal in 1970, and the facts involved were not comparable to the situation presented in the case at bar. A boiler manufacturer which, though it conducted no sales in this state and had no sales or other representatives here, received substantial revenue from the sale of its products which were resold in this state, was held properly subjected to the jurisdiction of our courts in a products liability action based upon an injury resulting from the failure of one of its boilers in this state. The court defined the standard for determining whether such "economic activity" within the state justified exercise of jurisdiction as follows: "A manufacturer engages in economic activity within a state as a matter of 'commercial actuality' whenever the purchase or use of its product within the state generates gross income for the manufacturer and is not so fortuitous or unforeseeable as to negative the existence of an intent on the manufacturer's part to bring about this result. [Citations.]" (71 Cal.2d at p. 902.)

Thus, though the decision is not expressly based upon the concept of acts done outside the state which are intended to cause effects within it, it is consistent with this concept insofar as it equates foreseeability and intent to bring about a result.

In *Buckeye* the court cites both *Hanson* and *McGee, supra,* and quotes the reference in *Hanson* to the defendant "invoking the benefits and protections" of the laws of the forum state. It is in this respect consistent with the effect given such element, *supra,* in this opinion.

The alternative writ is discharged and the peremptory writ is denied.

Ford, P. J., and Allport, J., concurred.