[Civ. No. 56588. Second Dist., Div. Three. Apr. 25, 1980.]

THOMAS J. PALMER, INC., et al., Plaintiffs and Appellants, v. TURKIYE IS BANKASI A.S., Defendant and Respondent.

COUNSEL

Baum & Cohen, Leonard P. Baum and Norman A. Mathews for Plaintiffs and Appellants.

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, James Polish and Steven Greenfeld for Defendant and Respondent.

OPINION

**POTTER, Acting P. J.**—Plaintiffs appeal from an order of the trial court quashing out-of-state service of summons upon defendant Turkiye Is Bankasi, a Turkish national bank (hereinafter referred to as Turkish Bank). The order, which was based on the court's "opinion that the exercise of jurisdiction herein as against the defendant Turkiye Is Bankasi A.S. would be unreasonable" is expressly made appealable by Code of Civil Procedure section 904.1, subdivision (c).

The complaint names several defendants in addition to Turkish Bank. Its allegations are generally described in the opinion of Division One of this court in *Crocker Nat. Bank* v. *Superior Court* (1977) 68 Cal. App.3d 863, 866-868 [136 Cal.Rptr. 481], as follows: "The underlying verified complaint (No. SOC 44418) filed by plaintiffs (real parties in interest) which was considered by the court below alleges that Natisco, a joint venture comprised of two Alabama corporations, entered into a contract to sell coal (hereinafter Coal Sales Contract) to defendant Turkish Iron and Steel Works (hereinafter Turkish Steel), and that the Coal Sales Contract required that the buyer, Turkish Steel, provide the seller, Natisco, with a letter of credit for the payment of the coal and in addition, required that Natisco, as seller, guarantee its performance by way of a letter of bank guaranty.

"The complaint further alleges that in a separate contract (hereinafter Financing Contract) plaintiffs agreed to furnish a letter of credit in the amount of $522,000 in order to satisfy Natisco's guaranty of performance obligation under the Coal Sales Contract; that in return, Natisco, the two Alabama corporations which formed Natisco, defendant Vulcan Energy Resources, a corporation, and defendant Charles S. Pettyjohn, an individual, agreed to furnish plaintiffs with a true copy of a $243,000 letter of credit allegedly previously secured as part of the

seller's performance guaranty under the Coal Sales Contract; that in addition the same parties agreed, inter alia, to give plaintiffs security interests in certain coal, a pledge of stock in the two Alabama corporations which had formed Natisco, the right to certain dollar amounts per ton of coal sold under the Coal Sales Contract and the assignment of Turkish Steel's letter of credit; that the terms and provisions of the Coal Sales Contract were not to be altered, amended or changed without the prior written consent of one of the plaintiffs.

"It is further alleged that on December 4, 1975, plaintiffs arranged to have Crocker issue an irrevocable letter of credit in the amount of $522,000 in favor of the beneficiary, defendant Turkiye Is Bankasi AS (hereinafter Turkish Bank); that the initial documentary requirement provided that the Turkish Bank furnish an authenticated cable stating that the amount drawn represents the amount it was required to pay under its guaranty of performance by Natisco for the delivery of coal in 1976 to Turkish Steel under the Coal Sales Contract and providing that the expiration date was December 31, 1976; that on December 5, 1975, that documentary requirement was cancelled in its entirety and a substituted documentary requirement provided for a signed statement by the Turkish Bank stating that the amount drawn represents the amount it was obligated to pay under its guarantee validity (unlimited in time) to Turkish Steel for the sum of up to $522,000 covering performance under the Coal Sales Contract (identified by reference numbers, date and parties) for the account of Natisco pertaining to shipments of 450,000 tons of coal to be delivered in 1976 according to the delivery schedule in the Coal Sales Contract; that the substituted provisions also stated that the letter of credit would be automatically extendable for further periods of six months until the Turkish Bank's guaranty was returned to it.

"The complaint additionally alleged that in March 1976 the Coal Sales Contract was amended in writing by Turkish Steel and Natisco without plaintiffs' consent which had the effect of altering and diminishing plaintiffs' rights under the Financing Contract and making plaintiffs' letter of credit a guaranty and performance bond as to the amended Coal Sales Contract.

"The complaint further sets forth that after the parties (other than plaintiffs) failed to fulfill their obligations under the Financing Contract, on April 13, 1976, plaintiffs foreclosed upon the pledge of stock

and thereby became the owner of all of the stock in one of the Alabama corporations and 98 percent of the stock in the other; that plaintiffs brought an action in Alabama against defendant Pettyjohn and others (who are not named defendants in the California action); that the Alabama court found that the defendants in the Alabama proceedings had made shipments of coal under the Coal Sales Contract after April 13, 1976, without authority to make such shipments on behalf of Natisco which plaintiffs then owned by reason of the foreclosure of stock; that the Alabama court permanently restrained the Alabama defendant from acting under the name of Natisco, from using the letters of credit emanating from the Coal Sales Contract, from making shipments of coal under the Coal Sales Contract with Turkish Steel, and from referring to the Coal Sales Contract by its reference numbers.

"The complaint alleges that the defendants[1] (excluding Crocker) have entered into a common plan or scheme to obtain and usurp the benefits of the Coal Sales Contract and plaintiffs' letter of credit; to prevent Natisco from performing under, or obtaining the benefits of, the Coal Sales Contract; to represent that they were authorized to act on behalf of Natisco; and to create irreparable injury to plaintiffs including the loss of $522,000 if demand is made upon the Crocker letter of credit."

The allegations concerning the alleged "common plan or scheme" require further description. Paragraph 29 of the complaint states: "The defendants herein, *excluding the defendant Crocker National Bank*, in doing the matters and things set forth herein, and in failing to do the matters and things set forth herein, did the same pursuant to a common plan, scheme, conspiracy, design and agreement among themselves, each acting as agent one for the other, with the permission, consent and authority of each other, to among other things": (1) obtain for themselves the benefits of the coal sales agreement and of the letter of credit; and (2) place plaintiffs in the position where they would sustain a loss if Crocker made demand under said letter of credit. A thorough search of the complaint, however, fails to disclose any allegation that Turkish Bank itself either did or failed to do anything. There is only the general allegation that anything done by all the defendants was done with its

---

[1]The defendants named in the complaint include the parties described in Division One's opinion as Turkish Bank, Turkish Steel, Vulcan Energy Resources, Charles S. Pettyjohn, and Crocker, plus the following: Smith Coal Sales Company, Williams & Rubin, a corporation, and Harry Geissinger III, an individual.

consent and authority and as its agent, and the conclusory allegation that all the defendants except Crocker "are conducting themselves and dealing with each other so as to deprive 'NATISCO' and plaintiffs of the benefits" of the coal agreement and the financing contract.

Turkish Bank's motion to quash service of summons was made several months after the complaint had been filed. One ground for quashing the service was the claim that "[t]he courts of this state lack personal jurisdiction over Turkish Bank." It was supported by affidavits delineating the nature of Turkish Bank's connection with California and describing its participation in the issuance of a letter of guarantee in favor of Turkish Steel.

The affidavit of the manager of Turkish Bank's foreign department at the head office set forth the following facts relating to Turkish Bank's presence in California as bearing upon the question of general jurisdiction: "Turkish Bank has never maintained any branches or offices, retained any agents, had any customers, solicited business of any kind, advertised, owned any real property or paid any taxes in California. With the exception of a bank account with a correspondent bank, Turkish Bank has never kept or owned any personal property in California.

"Turkish Bank's *sole* connection with California arises from international banking transactions conducted exclusively between banks...."

This affidavit specifies the various classes of banking transactions conducted, including "(1) the receipt and transmission of letters of credit, (2) processing documentary collections, (3) issuance and receipt of payment orders, (4) furnishing credit worthiness reports on Turkish Bank's customers in Turkey and (5) negotiating traveler's checks." The affidavit further states: "In order to assure prompt payment of such items as letters of credit and payment orders sent to correspondent banks in California, Turkish Bank maintains a single bank account with a correspondent bank in California."

A detailed description of the various categories of banking transactions follows. The only details in this respect pertinent to the issues on this appeal, however, are descriptions of the practices of the international banking community with respect to letter of credit transactions. These include transactions in which a letter of guarantee or "standby letter of credit" is employed. Most often, as in this case, a two-stage

transaction occurs. The first stage is the issuance of a letter of credit or guarantee by the obligor's bank in his country guaranteeing the accepting bank in the obligee's country as beneficiary that it will be reimbursed for any outlay it is called upon to make to the obligee under its letter of guarantee to such obligee. Under such arrangement, the obligor's domestic bank becomes the customer in whose behalf the second letter of guarantee is issued by the foreign bank. A further aspect of such transactions is then stated as follows: "As a matter of uniform custom and practice in the banking community, letters of credit are drafted so as to direct payment to the beneficiary upon presentation of documentation conforming to a specified *objective* standard. Neither the issuer nor the receiving bank concern themselves with the underlying transactions giving rise to the need for a letter of credit. *Thus, a letter of credit is honored as the primary obligation of the issuer upon presentation of the appropriate documents, regardless of any breach of or defect in the contractual undertaking giving rise to the letter of credit.* During my association with Turkish Bank, it has consistently adhered to the foregoing custom and practice."

The affidavit then details Turkish Bank's participation in the international banking transaction relating to the matters set forth in the complaint. The Crocker letter of guarantee, dated December 4, 1975, is attached as an exhibit. The exhibit constitutes an "irrevocable letter of credit," in favor of Turkish Bank, to the extent of $522,000 covering performance of the coal sales contract by Natisco. As beneficiary, Turkish Bank was entitled to payment upon furnishing "a beneficiary['s] signed statement stating that the amount drawn represents the amount you were obliged to pay under your guarantee validity unlimited in time in favor of" Turkish Steel. Also attached is Turkish Bank's letter of guarantee, issued to Turkish Steel as beneficiary. In accordance with the custom above stated, this document provides "that, in the event our Bank is notified by you in writing that the contractor has violated the provisions of the contract and/or has failed to perform his undertakings completely or partially, the amount under suretyship will be paid in cash and in full, immediately and without any delay to you or to your order upon your first written request. . . ."

The manager's affidavit further states that the Crocker letter of credit was unsolicited and that prior to receiving it, Turkish Bank had not issued any guarantee of such obligation and had not been requested to guarantee such obligation.

The affidavit also set forth the facts concerning Turkish Bank's receipt of notice (pursuant to the terms of its letter of guarantee) from Turkish Steel, stating in writing that Natisco "had failed to fulfill the conditions and terms of the coal sales contract." Upon the receipt of such notice in late January 1977, Turkish Bank paid the sum of $522,000 to Turkish Steel and "requested payment from Crocker under the Crocker letter of credit." At the time the affidavit was executed, Crocker had not reimbursed Turkish Bank. However, Crocker had credits with Turkish Bank in excess of $10 million at the time against which offsets could be made.

Plaintiffs' original opposition to the motion to quash service of summons filed in October 1977 included a declaration of plaintiff Palmer. The Palmer declaration attached a Turkish language document purporting to be a letter of guarantee from Turkish Bank to Turkish Steel covering deliveries under the coal sales contract specified for the year 1975, copies of telegrams and correspondence between plaintiffs and Turkish Bank, plaintiffs and Turkish Steel, and Crocker and Turkish Bank, in which plaintiffs asserted breaches on the part of Turkish Steel and attempted to withdraw the guarantee. The last document in this correspondence was a letter from Turkish Bank stating that Turkish Steel would not accept cancellation of the guarantee letter.

In their memorandum in opposition, plaintiffs requested that the hearing of the matter be continued for a time sufficient to allow plaintiffs to conduct discovery relating to the jurisdiction issue. Though the record on appeal does not show the precise mechanics, the hearing on Turkish Bank's motion to quash service of summons was continued from time to time until it was finally submitted on January 23, 1979. In the interim, numerous interrogatories were asked by plaintiffs and answered by Turkish Bank. The motion to quash service apparently was renewed by new notices of motion filed respectively May 31, 1978, and December 22, 1978. The latter motion attached affidavits supplementing the information contained in the affidavits in support of the original motion.

Additional facts were brought out concerning the final disposition of Turkish Bank's claim against Crocker on its letter of guarantee. The bank officer who authorized the payment on the guarantee to Turkish Steel stated the basis of such authorization as follows: "In accordance with the practices of Turkish Bank and the express terms of the letter of guarantee, I did not personally make, nor did I authorize, any inves-

tigation into the basis for the claim by Turkish Iron and Steel Works that NATISCO had failed to fulfill the conditions and terms of the coal sale contract. The decision to authorize payment to Turkish Iron and Steel Works was based entirely on a determination that the documentation presented to Turkish Bank conformed to the requirements of the letter of guarantee."

Further, with respect to the claim against Crocker on its letter of credit, such officer stated: "On or about October 24, 1977, Turkish Bank received payment credited to its account number 4.88.86913 with Bank of America, San Francisco, California. The amount of such credit was $521,989.80, as $10.20 in cable costs were deducted from the initial 522,000 dollar amount. Such credited funds were immediately transferred to the account of Turkish Bank with American Express International Banking Corporation in New York."

Additional factual material presented by plaintiffs came from two sources. The declaration of plaintiff Walker attached documentation indicating that Turkish Bank forwarded two bills to Crocker "representing correspondent's Bank Guarantee Commission plus other charges" and that Crocker, in turn, billed Walker for at least some of it.

The other source of facts relied upon by plaintiffs was the answers of Turkish Bank to plaintiffs' interrogatories. The information contained in these answers was collated by plaintiffs and presented in table form showing for the years 1970 through the first half of the year 1978 the number of international banking transactions with California banking institutions in each of the categories above described. There were transactions in each category each year, the number and dollar volume of which varied considerably, but generally was substantial. There were approximately 537 transactions with a total dollar volume in excess of $5,413,354.03. This included 139 transactions involving letters of credit and guarantee, received from or sent to California banks, with a total dollar volume of $2,932,127. This interrogatory material also showed that throughout this period Turkish Bank maintained a bank account with the San Francisco branch of the Bank of America which was its correspondent bank. This account, which was maintained to facilitate immediate transfer of funds pursuant to letters of credit and payment orders and to avoid delays involved in foreign currency transfers, experienced deposits, withdrawals and other transactions totaling 10,513

transactions during this period in which the lowest yearly average balance was $63,000 and the highest yearly average balance was $449,000.

The trial court's memorandum granting the motion indicated that it considered and rejected the two bases for the exercise of jurisdiction urged by plaintiffs. The court concluded that (1) Turkish Bank's international banking transactions with California banks, including its maintenance of an account with the Bank of America, did not constitute such "'extensive or wide-ranging' or 'substantial, continuous and systematic' [conduct] as to confer general jurisdiction within this state as against said defendant"; and (2) there was no showing of any acts of Turkish Bank in California giving rise to a cause of action and no showing of wrongful acts of Turkish Bank in Turkey causing effects in this state of such nature as to justify limited jurisdiction with respect to plaintiffs' alleged cause of action.

## Contentions

Plaintiffs contend that: (1) Turkish Bank's extensive and continuous international banking transactions, facilitated by its maintenance of a California bank account, established its presence in this state, subjecting it to the general jurisdiction of California courts and, (2) in any event, limited jurisdiction over plaintiffs' cause of action is justified by the substantial connection between that cause of action and both (a) Turkish Bank's established California business relationships, and (b) effects caused by Turkish Bank in California by its conduct elsewhere. Turkish Bank controverts both contentions and contends that even if the necessary minimal contacts have been shown, the assumption of jurisdiction would be improper because the balance of inconvenience favors Turkish Bank.

## Discussion

### Summary

Plaintiffs have the burden of showing the facts establishing jurisdiction. The trial court's finding against them must be upheld if the record, viewed most favorably to Turkish Bank, substantially supports such finding. So viewed, the record does not establish error. Turkish

Bank's presence in this state, sufficient for the exercise of general jurisdiction, was not shown. Nor was there evidence requiring the court to find a substantial connection between any wrongful conduct of Turkish Bank charged in the complaint and Turkish Bank's California business relationships or effects caused in this state so as to sustain limited jurisdiction over such cause of action. Consequently, the court properly denied jurisdiction, and it is unnecessary to balance the inconvenience of the parties.

### The Burden of Proof to Show Jurisdiction Was on Plaintiffs

■ Where a defendant properly moves to quash out-of-state service for lack of jurisdiction, "the burden of proof is upon the plaintiff to establish the facts of jurisdiction by a preponderance of the evidence. . . ." (*Arnesen* v. *Raymond Lee Organization, Inc.* (1973) 31 Cal.App.3d 991, 995 [107 Cal.Rptr. 744].)

Consequently, any factual issue as to which plaintiffs failed to produce evidence or as to which the evidence was evenly balanced was properly resolved in favor of Turkish Bank.

### The Trial Court's Findings May Not Be Disturbed on Appeal if Supported by Substantial Evidence

In *Arnesen, supra,* the order of the trial court quashing service of summons was affirmed. ■ The court stated the standard of review of such determination as follows (*id.,* at p. 995): "[W]here there is a conflict in the declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination of that court is supported by substantial evidence (*Vibration Isolation Products, Inc.* v. *American Nat. Rubber Co.,* 23 Cal.App.3d 480, 482 [100 Cal.Rptr. 269]; *Atkins, Kroll & Co.* v. *Broadway Lbr. Co., supra,* 222 Cal. App.2d 646, 654 [35 Cal.Rptr. 385, 12 A.L.R.3d 880]); . . ." In *Belmont Industries, Inc.* v. *Superior Court* (1973) 31 Cal.App.3d 281, 283 [107 Cal.Rptr. 237], the Fifth District of this court adopted the same standard of review.

### ■ Plaintiffs Failed to Sustain the Burden of Proving Turkish Bank's Presence in California for the Purpose of General Jurisdiction

The facts upon which plaintiffs rely to show Turkish Bank's presence in California for general jurisdiction purposes are its international

banking transactions with California banks, including its continuous maintenance of a California bank account in which a substantial balance was kept and a large number of transactions were carried out. The trial court acknowledged that the number of these transactions "would probably be sufficient to establish general jurisdiction" if their quality were of a suitable nature. In this respect, the court was obviously referring to the holding of the United States Supreme Court in *Bank of America* v. *Whitney Bank* (1923) 261 U.S. 171 [67 L.Ed. 594, 43 S.Ct. 311], which plaintiffs concede "appears on all fours with the case at bar." The defendant in that case maintained a correspondent relationship with six New York banks in each of which it had "an active, regular deposit account" and had engaged in "numerous" interstate banking transactions of a type indistinguishable from those involved in the case at bench. (*Id.*, at p. 172 [67 L.Ed. at p. 595].) Plaintiffs, however, would have us conclude that the holding in *Bank of America* has been undermined by subsequent changes in the law, citing in this respect the decision of our Supreme Court in *Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 148 [127 Cal.Rptr. 352, 545 P.2d 264]. Even if our Supreme Court were in a position to overrule the United States Supreme Court with respect to the requirements of due process, it is apparent from the decision in *Cornelison* that it has not purported to do so. General jurisdiction was found absent in that case, where the court said (*id.*, at pp. 148-149): "*Perkins*[2] and *Koninklijke L.M.* v. *Superior Court* (1951) 107 Cal.App.2d 495 [237 P.2d 297], illustrate the type of activity which has been held sufficient for the exercise of general jurisdiction. In *Perkins* the exercise of jurisdiction was premised on the fact that the defendant corporation had temporarily established virtually all of its administrative functions within the forum state while its overseas base of operations was controlled by a foreign power. In that circumstance the forum state could adjudicate a cause of action which was 'entirely distinct from [those administrative] activities' within the state. *Koninklijke* involved a Dutch airline which was compelled to defend a suit arising from an airplane accident in England. The defendant's substantial purchases of airplanes in California, some 30 local employees, and other local business operations were sufficient to warrant jurisdiction, even though the subject matter of the action was wholly unrelated to the business conducted by the corporation in California.

"In the present case, by contrast, defendant's activity in California consisted of some 20 trips a year into the state over the past 7 years to

---

[2]*Perkins* v. *Benguet Mining Co.* (1952) 342 U.S. 437 [96 L.Ed. 485, 72 S.Ct. 413].

deliver and obtain goods, an independent contractor relationship with a local broker, and a Public Utilities Commission license. In our view, these contacts are not sufficient to justify the exercise of jurisdiction over defendant without regard to whether plaintiff's cause of action is relevant to California activity. [Fns. omittted.]"

The above quotation indicates no retreat from the rule stated in *Bank of America*. The illustrations of facts justifying the exercise of general jurisdiction on the basis of the defendant's presence are of a totally different character than those here involved and those involved in *Bank of America*. Moreover, the facts in *Cornelison* found insufficient to justify exercise of general jurisdiction are quite comparable to those involved in this appeal.

It is, therefore, clear that the trial court did not err in denying jurisdiction on this basis.

*The Trial Court's Finding Against Limited Jurisdiction Finds Substantial Support in the Record*

■ Since the burden of proof on the jurisdictional issue rested upon plaintiffs, the trial court was entitled to reject limited jurisdiction if plaintiffs did not present a preponderance of evidence showing a substantial connection between wrongful conduct on the part of Turkish Bank, charged in the complaint, and its established California business relationships or effects of an appropriate nature[3] caused in California. An examination of the voluminous record is persuasive that an essential element of the required showing was missing. The missing element was any factual showing supporting a claim of any wrongful conduct of any kind on the part of Turkish Bank.

■ Though a verified complaint may be treated as a declaration for the purpose of sustaining plaintiffs' burden (*Arnesen v. Raymond Lee Organization, Inc., supra,* 31 Cal.App.3d at p. 995), this rule does not dispense with the requirement that all affidavits relied upon as probative must state evidentiary facts. As stated in 2 California Jurisprudence Third Affidavits, section 19, page 799: "Allegations in an affidavit, to comply with the requirement that they be clear and certain, must show facts and circumstances from which the ultimate fact sought to be proved may be deduced by the court. *An affidavit that recites*

---

[3]See discussion, *infra*, of limitations on the "effects" doctrine.

*only ultimate facts or conclusions of law is thus insufficient. ...* [Fn. omitted.]" (Italics added.)

Tested by this rule, plaintiffs' complaint is inadequate to constitute evidence of any wrongful conduct on the part of Turkish Bank. A close examination of the first 28 paragraphs reveals that the only references therein to Turkish Bank are the statements of its corporate capacity and the fact that it would be referred to as "Turkish Bank." There are no allegations therein of any conduct whatever on the part of Turkish Bank. The sole basis of any claim on plaintiffs' part against Turkish Bank is its alleged responsibility for wrongful conduct of other defendants described in the first 28 paragraphs of the complaint. The basis for such responsibility is stated in paragraph 29 where it is alleged: "The defendants herein, *excluding the defendant Crocker National Bank*, in doing the matters and things set forth herein, and in failing to do the matters and things set forth herein, did the same pursuant to a common plan, scheme, conspiracy, design and agreement among themselves, each acting as agent one for the other, with the permission, consent and authority of each other, . . . . "

It is obvious that these are not allegations of probative fact. At best, they constitute a statement of ultimate facts, and at worst they are pure conclusions. All the other allegations of the complaint specifically referring to Turkish Bank are of the same nature. For example, it is charged generally (1) that all defendants "pursuant to the aforesaid common plan, scheme, conspiracy, design and agreement among themselves, are conducting themselves and dealing with each other so as to deprive 'NATISCO' and plaintiffs of the benefits of" the financing agreement and the coal sales agreement, and (2) that the various described contracts between other defendants were entered into "pursuant to a common plan, scheme, conspiracy, design and agreement by and between all of the defendants hereto . . . . " These allegations of the complaint are probative of nothing whatever. There is, consequently, a total lack of any proof that any of the wrongful conduct charged against Turkish Bank in the complaint occurred at all, unless plaintiffs' opposition declarations, the discovery material, or Turkish Bank's factual showing supplies that necessary element.

Examination of all such material shows that it contains no evidence of any wrongful conduct on the part of Turkish Bank. It shows, rather, that Turkish Bank was the conduit through which what may have been an unjustified claim of Turkish Steel for damages resulting

from nonperformance of the coal sales agreement was satisfied at plaintiffs' expense. The facts shown in this respect were that Turkish Bank accepted Turkish Steel's demand and, in turn, demanded and received reimbursement from Crocker, which presumably Crocker has charged to plaintiffs' account. The uncontradicted evidence, however, was that Turkish Bank was placed by plaintiffs in the position where it clearly was legally obliged to satisfy the claim of Turkish Steel. The express terms of its letter of guarantee naming Turkish Steel as beneficiary gave it no choice. Turkish Bank's affidavits also showed clearly that the applicable international banking customs required its letter of guarantee to so provide that payment be made on the basis of the documentation called for without questioning the foundation for the beneficiary's demand.

Turkish Bank's affidavits further showed that it only issued its letter of guarantee when requested by Crocker and made its payment without any attempt to investigate the merits of Turkish Steel's claim. These facts negate rather than support an inference that Turkish Bank's acts in this respect were pursuant to any common plan, scheme, conspiracy or design between it and the other defendants. The existence of such a plan, moreover, is in no way suggested by plaintiffs' showing that prior to the payment to Turkish Steel, plaintiffs had advised Turkish Bank of the existence of a dispute between them and Turkish Steel in respect of performance under the coal sales agreement. Turkish Bank's letter of guarantee clearly foreclosed it from withholding payment on any such basis.

The rule in this respect is stated by the Fourth Circuit in *Courtaulds North America, Inc.* v. *N.C. Nat. Bank* (4th Cir. 1975) 528 F.2d 802, 805, where the court said: "In utilizing the rules of construction embodied in the letter of credit—the Uniform Customs and State statute—one must constantly recall that the drawee bank is not to be embroiled in disputes between the buyer and the seller, the beneficiary of the credit. The drawee is involved only with documents, not with merchandise. Its involvement is altogether separate and apart from the transaction between the buyer and seller; its duties and liability are governed exclusively by the terms of the letter, not the terms of the parties' contract with each other."

To like effect is the statement of the Ninth Circuit in *H. Ray Baker, Inc.* v. *Associated Banking Corp.* (9th Cir. 1979) 592 F.2d 550, 553: "If

the presented documents comply with the terms of the letter of credit, the bank is obligated to pay regardless of whether the goods themselves conform to the contractual terms."

The applicability of this rule of law to this very case is shown by the decision of Division One of this court in plaintiffs' former appeal in this matter in *Crocker Nat. Bank* v. *Superior Court, supra*, 68 Cal.App.3d 863, 869, where the court observed that Crocker's letter of credit was "independent of the underlying contract."

The evidence in the trial court, therefore, showed no conduct whatever on the part of Turkish Bank which could support the allegation of the complaint that it was a participant in the manifold wrongs charged against the other defendants. In short, all that plaintiffs have shown is innocent conduct on the part of Turkish Bank as a result of which it has become an instrumentality by which the other defendants' wrongs have injured it.

Plaintiffs' action was pending for over two years when the motion to quash service of summons was submitted. Plaintiffs were allowed to conduct discovery in order to support their claim of jurisdiction. Despite all of the time and opportunity afforded them to develop some evidence establishing a nexus between defendant's conduct and the wrongful conduct of the other defendants, plaintiffs wholly failed to do so. The conclusion, therefore, is inescapable that their conclusory allegations charging Turkish Bank with complicity in the other defendants' wrongs are frivolous. Though plaintiffs are not required fully to prove their claims, their opposition to the motion to quash service of summons required them to at least show that there was a good-faith basis for the claims alleged in the complaint. It was apparent from the record in the trial court that there was no good-faith basis for those claims. We need not, therefore, concern ourselves with whether jurisdiction over such cause of action would properly be exercised if there were any good-faith basis for maintaining it.[4]

---

[4]The basis for jurisdiction in such a case would, of course, be entirely different from that available to plaintiffs in respect of some independent violation of Turkish Bank's obligations as a confirming international bank. If in fact all the other defendants were acting as agent for Turkish Bank in respect of all the conduct described in the complaint, then Turkish Bank was a party to the financing contract made here in California, allegedly without intent to perform. In that event, the suit against it would be for breach of its contract made here and for frauds committed here, and the reasonableness of the exercise of jurisdiction would be supportable on the basis of those factors alone.

As above pointed out, plaintiffs have not made a showing of any violation by Turkish Bank of its obligations as the issuer of the letter of guarantee to Turkish Steel. Even if such a showing were made, the established facts do not show that it would be reasonable for California courts to exercise jurisdiction over a claim based on such a violation. ■ The plaintiffs urge jurisdiction on the basis that by paying the guarantee to Turkish Steel in Turkey and reimbursing itself in California, Turkish Bank has caused effects in California and has invoked the protection of California law to such an extent that jurisdiction of a cause of action based on the injury thus caused to plaintiffs is established. Assuming for the purpose of argument only that Turkish Bank had violated any duties to plaintiffs in this respect, there still would be no adequate basis for the exercise of jurisdiction.

The furthest extension of jurisdiction on the basis of such causing of effects in California is the decision of this division in *Quattrone* v. *Superior Court* (1975) 44 Cal.App.3d 296 [118 Cal.Rptr. 548]. In that case, we upheld the exercise of jurisdiction over a nonresident defendant, a Pennsylvania resident, who had prepared deceptive financial data intended to be acted upon in California to determine the rate of exchange for corporate shares to be issued in this state. After discussing the decisions of the United States Supreme Court in *Hanson* v. *Denckla* (1958) 357 U.S. 235 [2 L.Ed.2d 1283, 78 S.Ct. 1228] and *McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199], this court stated the rule governing the exercise of jurisdiction on such a basis as follows: "From *McGee* and *Hanson* we conclude that it is reasonable to exercise jurisdiction on the basis of the defendant intentionally causing 'effects in the state by an omission or act done elsewhere' whenever (a) the effects are of a nature 'that the State treats as exceptional and subjects to special regulation,' or (b) the defendant has, in connection with his causing such effects in the forum state, invoked 'the benefits and protections of its laws.'" (*Quattrone* v. *Superior Court, supra*, 44 Cal.App.3d at p. 306.)

In *Sibley* v. *Superior Court* (1976) 16 Cal.3d 442, 446 [128 Cal.Rptr. 34, 546 P.2d 322], our Supreme Court agreed and stated in pertinent part: "The mere causing of an 'effect' in California, however, as acknowledged in the Judicial Council comment quoted above, is not necessarily sufficient to afford a constitutional basis for jurisdiction; notwithstanding this 'effect,' the imposition of jurisdiction may be 'un-

reasonable.' As was held in *Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310, a suit may not be maintained where jurisdiction offends "'traditional notions of fair play and substantial justice.'" (*Id.,* at pp. 316-317 [90 L.Ed. at pp. 101-103], citations omitted.)"

In setting aside the trial court's denial of a motion to quash service of summons, the *Sibley* court specifically relied upon the plaintiff's failure to show "that petitioner purposefully availed himself of the privilege of conducting business in California or of the benefits and protections of California laws" (16 Cal.3d at p. 447) and noted "[t]here are no aspects of this arms-length transaction which are subject to special regulation in California or in which California has otherwise manifested exceptional interest" (*id.,* at p. 448).

The inquiry then must be whether Turkish Bank's causing effects in California in this instance qualifies as a "reasonable" basis for the exercise of jurisdiction because the end result was "subject to special regulation in California" (*ibid.*) or because it involved Turkish Bank availing itself "of the benefits and protections of California laws" (*id.,* at p. 447). The record is devoid of any proof of either element. Contrary to the situation presented in *Quattrone,* plaintiffs point to no special California regulation governing international banking transactions of national banks.

Nor does plaintiffs' showing satisfy the alternative condition of the nonresident having invoked "the benefits and protections of California laws." (*Sibley* v. *Superior Court, supra,* 16 Cal.3d at p. 447.) Neither Turkish Bank's engaging in the letter of guarantee transaction with Crocker nor its receipt of reimbursement through its bank account with Bank of America has been shown to involve any invocation of such benefits. Both Crocker and Bank of America are national banks whose powers are granted by the National Bank Act (12 U.S.C. § 21 et seq.).

In *Downey* v. *City of Yonkers* (2d Cir. 1939) 106 F.2d 69, 73, the court said: "The measure of the powers of a national bank, on the other hand, is the statutory grant and powers not conferred by Congress are denied. The Act under which national banks are organized constitutes a complete system for their government. *Cook County Nat. Bank* v. *United States,* 107 U.S. 445, 448, 2 S.Ct. 561, 27 L.Ed. 537; *California National Bank* v. *Kennedy,* 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198."

As the United States Supreme Court said in *Easton* v. *Iowa* (1903) 188 U.S. 220, 231 [47 L.Ed. 452, 457, 23 S.Ct. 288]: "It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute."

It, therefore, does not appear that Turkish Bank has, in connection with the letter of guarantee transaction, in any way invoked the laws of this state; it has merely utilized the facilities of national banks which are entirely the creatures of our federal government as the means by which to receive compensation for services rendered by it and liability incurred by it in Turkey.

Turkish Bank's receipt of consideration from such California source does not suffice to make reasonable the exercise of jurisdiction in this case. The mere fact that a nonresident defendant receives income from California in payment for services rendered elsewhere does not provide a basis for jurisdiction in this state.

In *Archibald* v. *Cinerama Hotels* (1976) 15 Cal.3d 853 [126 Cal.Rptr. 811, 544 P.2d 947], the sale of defendants' Hawaiian hotel accommodations by nonexclusive independent travel agents in California who forwarded room deposits of "one full night's lodging" (*id.*, at p. 863) was held not sufficient to justify the assumption of jurisdiction.

In *Floyd J. Harkness Co.* v. *Amezcua* (1976) 60 Cal.App.3d 687 [131 Cal.Rptr. 677], a California plaintiff, who had advanced funds to a Mexican grower in respect of vegetables to be delivered in Arizona, was held not entitled on that basis to subject the Mexican grower to the jurisdiction of the California court. In so ruling, the court said (*id.*, at pp. 691-692): "In examining the quality and nature of the activities in this state, it is settled that we are not concerned with the performance of the plaintiff in California but exclusively with the nonresident defendant's activities in this state. It is the latter activities which must provide the basis for jurisdiction. (*Cornell University Medical College* v. *Superior Court* (1974) 38 Cal.App.3d 311, 316 [113 Cal.Rptr. 291].) It follows that the fact that the plaintiff advanced money from California, a fact upon which plaintiff places heavy reliance, is virtually eliminated as a factor to be weighed herein."

The foregoing demonstrates that the court did not err in refusing to sustain limited jurisdiction.

### Disposition

The judgment is affirmed.

Cobey, J., and Allport, J., concurred.