[No. A043521. First Dist., Div. One. Apr. 16, 1990.]

SEAGATE TECHNOLOGY, Plaintiff and Appellant, v. A.J. KOGYO COMPANY, LTD., et al., Defendants and Respondents.

[Opinion certified for partial publication.*]

---

* Pursuant to rules 976 and 976.1 of the California Rules of Court, this opinion is certified for partial publication. The portions to be published follow.

COUNSEL

Wilson, Sonsini, Goodrich & Rosati, James A. DiBoise, Michael F. Grady and J. Peter Shearer for Plaintiff and Appellant.

Wendel, Rosen, Black, Dean & Levitan, Donald A. McIsaac and Christine K. Noma for Defendants and Respondents.

## OPINION

**STEIN, J.**—Plaintiff Seagate Technology appeals from the order of the superior court dismissing its complaint against Tamotsu Nakata on the grounds of lack of personal jurisdiction.

Nakata, a Japanese citizen who resides in Japan, was, at all times relevant, the president of A.J. Kogyo Co., Ltd. (Kogyo), an established Japanese corporation. Hiroshi Tanaka (also known as Matt Taylor) had worked for Nakata in Japan. Tanaka and Nakata decided that the United States presented a market for computer-related products, and Tanaka came to California in order to set up a business to take advantage of that market: Nippon Electronic Technology (NET). Nakata, the major investor in the new corporation, became its president and major shareholder. Tanaka was named as vice-president and was issued corporate shares on the basis of his services.

Seagate Technology (Seagate) is a corporation engaged in the manufacture of "rigid" or "hard" disk drives: information storage devices used in conjunction with small computer systems. Seagate was approached by Tanaka on behalf of NET, seeking to purchase, on credit, substantial quantities of disk drives. Seagate was unwilling to extend credit to NET without some sort of a guaranty.

In the fall of 1986, Nakata came to California where he met with representatives from Seagate and with Tanaka. In a declaration filed in support of the motion to dismiss, Nakata declared that "as is customary in Japan in establishing a new business, I met with many Japanese banks to introduce myself and exchange business cards." "In addition to meeting with the bank, I also met with Seagate . . . . I had no knowledge regarding the purpose of the meeting, except that NET was interested in transacting business with Seagate. At the meeting, I did not understand anything that was said. I only went along with Mr. Tanaka to introduce myself to Seagate as the president and shareholder of NET and to provide NET with a credit reference. . . . When I returned to Japan, I received a fax from Mr. Tanaka advising me that Seagate wanted a reference letter from Kogyo. I sent Seagate a letter in Japanese which I intended to be a credit reference, certifying that NET was affiliated with Kogyo and certifying that the credit

and responsibility of NET is founded on the same basis as that of Kogyo. . . . It was my intent that this certificate was to be a letter of introduction for NET and a credit reference. I did not know what the letter was to be used for except that NET needed it in order to begin the business transaction with Seagate."

The letter at issue is in Japanese. However, an English translation, provided by Tanaka, was typed onto it: "This letter certifies the fact that NIPPON ELECTRONIC TECHNOLOGY is a branch of A.J. KOGYO CO., LTD. and a member of the A.J. KOGYO enterprise. Therefore, as parent company, A.J. KOGYO CO., LTD guarantees all credibility, responsibility, and liability of the action taken by NIPPON ELECTRONIC TECHNOLOGY . . . . A.J. KOGYO CO., LTD. NIPPON ELECTRONIC TECHNOLOGY. Tamotsu Nakata PRESIDENT" Nakata, stating his understanding that "the English translation of my letter is not precise," declared "It was never my intention that the certificate letter . . . would guarantee any of NET's business transactions with Seagate. My letter to Seagate was intended to be a credit reference to cover the first transaction only, when NET was not established as a business."

For a short period of time the operation between Seagate and NET went smoothly. However, within four months of Nakata's letter, two invoices, representing a total amount of $256,550, went unpaid. NET then declared bankruptcy. By the instant action, Seagate sought to recover its loss from Kogyo and from several individuals, including Nakata, who it alleges conspired to defraud it. Both Kogyo and Nakata sought to quash service of process. The court denied Kogyo's motion, but granted Nakata's.

### DISCUSSION

When a defendant has moved to dismiss for lack of jurisdiction, the plaintiff has the burden of establishing that jurisdiction is proper. (*Evangelize China Fellowship, Inc.* v. *Evangelize China Fellowship* (1983) 146 Cal.App.3d 440, 444 [194 Cal.Rptr. 240]; *Arnesen* v. *Raymond Lee Organization, Inc.* (1973) 31 Cal.App.3d 991, 994 [107 Cal.Rptr. 744].)

California's courts are entitled to exercise personal jurisdiction over foreign defendants "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The basic test is whether the defendant had "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations.]" (*Internat.*

*Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057].)

■ Nakata's contacts with the state as an individual appear to be nonexistent; his only contact was as the president of NET or of Kogyo. It follows that jurisdiction may not be had over him on the basis of his contacts as an individual.[1]

Since a corporation is an entity separate and apart from its shareholders, its directors and its corporate officers, Nakata asserts the so-called "fiduciary shield doctrine," arguing that any contact he made with the state as an officer of Kogyo or of NET was the contact of the corporation and could not therefore be used as a basis for the exercise of in personam jurisdiction over him. He relies on *Mihlon* v. *Superior Court* (1985) 169 Cal.App.3d 703, 713 [215 Cal.Rptr. 442], where the court stated, "it is well established by California case law that for jurisdictional purposes the acts of corporate officers and directors, in their official capacities, are acts exclusively of (*qua*) the corporation, and are thus not material for purposes of establishing minimum contacts as to individuals." Our review of the relevant legal principles convinces us that this dictum in *Mihlon* is wrong.

■ For purposes of liability, the acts of the corporation may or may not be the acts of the individual. "It is well settled that corporate directors cannot be held *vicariously* liable for the corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. [Citation.] '[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.' [Citations.] [¶] Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated

---

[1] Contrast *Hi Fashion Wigs, Inc.* v. *Peter Hammond Adv., Inc.* (1973) 32 N.Y.2d 583 [347 N.Y.2d 47, 300 N.E.2d 421] where it was found that the forum state was entitled to exercise personal jurisdiction över the president of a corporation which had allegedly defaulted on agreed payments, not because he was a corporate officer, but because he had guaranteed payment in his *individual* capacity. (*Id.* at pp. 421, 423; see, also, *Mr. Steak, Inc.* v. *Dist. Court, etc.* (1978) 574 P.2d 95 [574 P.2d 95] where the defendant, Warren Wilson, had agreed both as president of Steak and Onions, Inc., and as an individual, to pay certain sums of money to the plaintiff. The plaintiff brought an action against Steak and Onions, Inc. and against Wilson personally, arising from the alleged breach of that agreement. It was held that jurisdiction might be asserted over Wilson, but that jurisdiction was predicated not on his actions on behalf of the corporation, but on his *personal* guaranty.)

in the tortious conduct. [Citations.] [¶] Directors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. [Citations.] This liability does not depend upon the same grounds as 'piercing the corporate veil,' on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act. [Citation.] [¶] This rule has its roots in the law of agency. Directors are said to be agents of their corporate principal. (Corp. Code, § 317, subd. (a).) And '[t]he true rule is, of course, that the agent is liable for his own acts, regardless of whether the principal is liable or amenable to judicial action. [Citation.] Moreover, directors are not subordinate agents of the corporation; rather, their role is as their title suggests: they are policymakers who direct and ultimately control corporate conduct. Unlike ordinary employees or other subordinate agents under their control, a corporate officer is under no compulsion to take action unreasonably injurious to third parties. But like any other employee, directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties. The reason for this rule is that otherwise, a director could inflict injuries upon others and then escape liability behind the shield of his or her representative character, even though the corporation might be insolvent or irresponsible. [Citations.] Director status therefore neither immunizes a person from individual liability nor subjects him or her to vicarious liability." (*Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503-505 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447].)

 Thus, some acts taken by a corporate officer are not only the acts of the corporation, but the acts of the individual. Where an act of this type creates contact with the forum state, that contact may be the contact of the individual as well as the contact of the corporation and, therefore, should be considered in determining if the forum state has personal jurisdiction over the individual.

 The basis for the exercise of jurisdiction over Nakata is that in causing Kogyo to issue the guaranty, Nakata caused the in-state "effect" that Seagate extended credit to NET. The Restatement Second Conflict of Laws, quoted in the Judicial Council's comments to Code of Civil Procedure section 410.10, recognizes that an individual may have contact with the forum state where he causes another to act whether or not the individual has himself contacted the state. Thus, comment a to section 37 of the Restatement Second, Conflict of Laws states: "A state has a natural interest in the effects of an act within its territory even though the act itself was

done elsewhere. The state may exercise judicial jurisdiction on the basis of such effects over the individual who did the act, or who caused the act to be done, provided that the nature of these effects and of the individual's relationship to the state are such as to make the exercise of jurisdiction fair to the individual and reasonable from the standpoint of the international and interstate systems. . . ."

The Judicial Council notes, "The act may have been done with the intention of causing effects in the state. If so, the state may exercise the same judicial jurisdiction over the actor, *or over the one who caused the act to be done,* as to causes of action arising from these effects as it could have exercised if these effects had resulted from an act done within its territory." (Italics added; see also *Quattrone* v. *Superior Court* (1975) 44 Cal.App.3d 296, 303-304 [118 Cal.Rptr. 548].)

It follows that if a corporate officer may be held personally responsible for causing the corporation to act, that act may be imputed to the officer for purposes of establishing personal jurisdiction over him.

Our conclusion that the fiduciary shield doctrine should not be applied to defeat jurisdiction is supported by the recent decision in *Taylor-Rush* v. *Multitech Corp.* (1990) 217 Cal.App.3d 103 [265 Cal.Rptr. 672]. There the court noted that the fiduciary shield doctrine is inconsistent with the legislative intent behind California's long-arm statute which is designed to provide personal jurisdiction to the fullest extent constitutionally permissible. (*Id.* at p. 116.) The court at page 117 criticized *Mihlon* for its failure to discuss United States Supreme Court authorities on point and concluded the better rule is that where corporate officers are alleged to have engaged in intentional tortious activity, directed at a California resident, jurisdiction over them is proper. (See *Calder* v. *Jones* (1984) 465 U.S. 783, 789-790 [79 L.Ed.2d 804, 812, 104 S.Ct. 1482].) We agree. Thus, in *Calder* the court rejected the "suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." (*Keeton* v. *Hustler Magazine, Inc.* (1984) 465 U.S. 770, 781, fn. 13 [79 L.Ed.2d 790, 802, 104 S.Ct. 1473].)

■ We also agree with our colleagues that "intentional tortfeasors should be prepared to defend themselves in any jurisdiction where they direct their alleged tortious activity." (*Taylor-Rush* v. *Multitech Corp., supra,* 217 Cal.App.3d at p. 118.) An act taken by a corporate officer may subject the officer to in personam jurisdiction. The act must be one for which the officer would be personally liable and the act must in fact create

contact between the officer and the forum state. (For example, no personal contact would result from doing nothing more than ratifying an act taken by the corporation or by another corporate officer.) If both requirements are met, the act may be considered in determining if the contacts between the individual and the state are substantial enough as to permit the state to exercise personal jurisdiction over the individual, or whether the exercise of personal jurisdiction over the defendant offends "traditional notions of fair play and substantial justice." That is, the act may be considered in determining whether (1) the defendant "has engaged in activity of the requisite quality and nature in the forum state and that the cause of action is sufficiently connected with this activity" *and* (2) whether "a balancing of the inconvenience to the defendant in having to defend itself in the forum state against both the interest of the plaintiff in suing locally and the interrelated interest of the state in assuming jurisdiction" justifies subjecting the foreign resident to the process of the forum's courts. (*Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893, 898-899 [80 Cal.Rptr. 113, 458 P.2d 57].)

Here, the relevant acts fall into two categories: the acts of NET and/or Tanaka as vice-president of NET, and the acts of Nakata himself. There is ample evidence in the record, which the trial court impliedly accepted as true, that it was Tanaka and not Nakata who managed NET, and that Nakata's relationship with NET was little more than that of an investor. We may not disturb that finding (*Magnecomp Corp.* v. *Athene Co.* (1989) 209 Cal.App.3d 526, 533; [2d Dist) 209 Cal.App.3d 526, 257 Cal.Rptr. 278]; *Kroopf* v. *Guffey* (1986) 183 Cal.App.3d 1351, 1359 [228 Cal.Rptr. 807]; *Evangelize China Fellowship, Inc.* v. *Evangelize China Fellowship, supra,* 146 Cal.App.3d at p. 444), and by it, the acts of NET may not be imputed to Nakata for purposes of liability and, accordingly, may not be imputed to him for purposes of establishing minimum contacts.

Nakata's own contact with California is quite limited. Indeed, his only relevant contact appears to have been to visit several California banks, to attend a meeting in California and to send a letter from Japan to California. He was not personally doing business within the state, nor did he otherwise have such contact with it as to permit the exercise of personal jurisdiction over him based upon his in-state actions.

Accordingly, the only basis for jurisdiction rests on the concept of causing an "effect" in the forum state; here, the extension of credit to NET because of the guaranty issued by Nakata as president of both NET and Kogyo. Under *Frances T.* v. *Village Green Owners Assn., supra,* 42 Cal.3d 490, that Nakata wrote and sent the letter might be sufficient to subject him

to personal liability for any resulting tort; i.e., for causing a tortious effect in the state.[2] Further, the act at issue was Nakata's and thus the resulting contact, while also contact with the state by Kogyo, was contact by Nakata individually.

The remaining question is whether that contact satisfies the requirements of Code of Civil Procedure section 410.10 such that the assertion of jurisdiction over Nakata does not offend "traditional notions of fair play and substantial justice."

In *Sibley* v. *Superior Court* (1976) 16 Cal.3d 442 [128 Cal.Rptr. 34, 546 P.2d 322], the plaintiff entered into a partnership agreement with a third party, in part because of the guarantee of Sibley that the third party would pay the plaintiff specified monthly sums. When the payments were not made, the plaintiff brought an action against Sibley. The court found that Sibley may have caused the "effect" that the plaintiff entered into partnership with Sunrise, but that jurisdiction could not be had over Sibley because his contact with the state was insufficient. The court noted that the plaintiff had not assumed any obligations to Sibley which could be enforced in California, and distinguished the situation before it with those in which jurisdiction was predicated on the fact that the defendants had sought or obtained significant benefits from the forum-related activity: "For example, in *Buckeye Boiler Co.* v. *Superior Court,* [*supra,* 71 Cal.2d 893], substantial business was generated in this state which benefited the party over which jurisdiction was sought; in *Michigan Nat. Bank* v. *Superior Court* (1972) 23 Cal.App.3d 1 [99 Cal.Rptr. 823], goods purchased in California were financed by the nonresident defendant; in *National Life of Florida Corp.* v. *Superior Court* (1971) 21 Cal.App.3d 281 [98 Cal.Rptr. 435], contract negotiations by the parties occurred in California concerning the sale of shares of stock to California residents by the nonresident defendants; and in *Quattrone* v. *Superior Court, supra*, 44 Cal.App.3d 296, it was alleged that the nonresident defendant was involved in a conspiracy to defraud a California corporation for his own profit by submitting falsified financial records to this corporation. By contrast, in the present case . . . there is no indication that petitioner intended to conduct business or in any other way directly or indirectly gain from dealings in this state." (*Id.* at pp. 447-448.)

Nakata's situation is closer to those in the cases distinguished by *Sibley* than to that in *Sibley* itself. By guaranteeing NET's liabilities, Nakata

---

[2] We emphasize that Nakata could not be held personally liable for the breach of the agreement to guarantee. His liability, if any, must be for the tortious misrepresentation that Kogyo would in fact make good on the guaranty. (See 1 Marsh's Cal. Corporation Law, p. 473, citing *Hall* v. *Crandall* (1866) 29 Cal. 567 [at p. 571].)

enabled NET to do business with Seagate; i.e., to conduct business within the forum state and to obtain the benefits and protections of its laws. The guaranty was the method by which NET was to receive direct, and Nakata indirect, economic advantage from business conducted within the state. For these purposes it is not particularly relevant that the party directly benefited was NET rather than Nakata himself. Had NET been owned by another, the result might be different; but Nakata was NET's major shareholder and had a real interest in its profits. Any economic benefit gained by NET was also gained by Nakata personally.[3]

The trial court did not state its reasons for finding in favor of Nakata. We note, however, that it ruled against Kogyo, and that the corporation's contacts with California appear to have been made through Nakata. It follows that the decision to grant the motion to quash as to Nakata was based on the suggestion in *Mihlon* that having acted in a corporate capacity, Nakata could not have established contacts as an individual.

Our finding that the reason for the ruling was incorrect does not, of course, end the matter. Jurisdiction may be defeated by a finding that Nakata did not personally cause Kogyo to issue the guaranty, that the letter as written by Nakata (as opposed to Tanaka's translation) was not in fact a guarantee to make good the debts at issue, or by a finding that there was no misrepresentation by Nakata—that the letter was written with the intention of performing, although the promise stated was later breached. These are issues which should be litigated in the trial court, and our decision here is not intended to dispose of them. We note further that by finding that Nakata's contacts with the state were not sufficient to confer jurisdiction over him, the trial court had no need to address the additional question of convenience of forum. (*Buckeye Boiler Co.* v. *Superior Court, supra*, 71 Cal.2d 893 at pp. 898-899.)[4]　■　Even if a nexus exists between a defendant's forum-related conduct and the plaintiff's causes of action, jurisdiction is proper only if it would not be unreasonable. Whether jurisdiction is reasonable turns on "the balancing of the convenience of the parties and the

---

[3] Cf. *Pacific Atlantic Trading Co.* v. *M/V Main Exp.* (9th Cir. 1985) 758 F.2d 1325, cited by Nakata, where the court found that the guaranty of a foreign resident could not sustain a finding of minimum contacts absent evidence that the defendant had also invoked the benefits of California laws. (*Id.* at p. 1328.) Nakata also cites *Asahi Metal Industry Co.* v. *Superior Court* (1987) 480 U.S. 102 [94 L.Ed.2d 92, 107 S.Ct. 1026], where the court held the placement of a product into the stream of commerce, without more, is not an act of the defendant "*purposefully directed toward the forum State.*" (*Id.* at p. 112 [94 L.Ed.2d at p. 104], italics in original.) Here the guaranty at issue *was* purposefully directed toward the forum state.

[4] That the court impliedly found against Kogyo on the issue of convenience of forum does not require a similar finding as to Nakata as an individual, who may be far less able to litigate in a foreign jurisdiction than could the corporation.

interests of the state in assuming jurisdiction." (*Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 148 [127 Cal.Rptr. 352, 545 P.2d 264].)

. . . . . . . . . . . . . . . . . . . .*

The order quashing service of summons is reversed. The matter is remanded to the superior court for further proceedings consistent with this opinion.

Racanelli, P. J., and Holmdahl, J.,† concurred.

A petition for a rehearing was denied May 16, 1990, and respondents' petition for review by the Supreme Court was denied July 10, 1990.

.

---

*See footnote, *ante*, page 696.
†Assigned by the Chairperson of the Judicial Council.