Filed 5/1/26  Keyway Pride Limited v. Reuben CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| KEYWAY PRIDE LIMITED LLC, Plaintiff and Appellant, v. SIMON REUBEN, Defendant and Respondent. | B340135 (Los Angeles County Super. Ct. No. 21SMCV00182) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael E. Whitaker, Judge.  Affirmed.

Barnes & Thornburg, David P. Schack, Matthew B. O'Hanlon, and Brian T. Nguyen for Plaintiff and Appellant.

Greenberg Traurig, Eric V. Rowen, and Matthew R. Gershman for Defendant and Respondent.

Plaintiff Keyway Pride Limited LLC (plaintiff) asserted various civil claims against defendant Simon Reuben (Simon) and others based on their involvement in the allegedly unauthorized transfer of plaintiff's real property located in Beverly Hills. Simon is a British citizen residing in Monaco. The trial court granted Simon's motion to quash plaintiff's summons for lack of personal jurisdiction. We consider whether Simon's role as a beneficial owner of entities that were involved in lending funds secured by plaintiff's property and that later purported to acquire the property is sufficient to establish he (apart from the entities) is subject to personal jurisdiction in California.

## I. BACKGROUND

A.    *The Disputed Property Transactions and Ensuing Lawsuit*

Plaintiff is a California limited liability company formed in 2017. Its operating agreement provides its sole member is a Delaware limited liability company called Midas Commodities Agents Delaware LLC (Midas).[1] Plaintiff asserts its "ultimate beneficial owner" is Kimora Lee Simmons Leissner (Simmons). Plaintiff characterizes Tim Leissner (Leissner) as Simmons's "now estranged husband."

Plaintiff acquired 25 Beverly Park Circle in Beverly Hills (the Property) in 2017. Simmons lived at the Property with her children at all relevant times. In 2018, plaintiff borrowed $12 million from Koronus Holdings Designated Activity Company

---

[1]    Midas changed its name to Z-One LLC in 2019.

2

(Koronus) secured by a deed of trust against the Property.[2]  The loan documents were executed by Gregory Robinson (Robinson) on behalf of Midas as Keyway's manager.  Robinson also executed a first amendment to the deed of trust the following year.

In November 2020, Leissner purported to enter into a purchase and sale agreement on behalf of plaintiff transferring the Property to defendant 25 Beverly Park Circle Propco LLC (Propco).  Around the same time, Leissner purported to enter a contract on plaintiff's behalf leasing the Property back from Propco for one year.  A lease rider provided plaintiff an option to purchase the Property within one year for approximately $17.6 million.

Plaintiff filed a complaint against Propco in 2021 to cancel deed and quiet title.  Plaintiff filed the operative first amended complaint in 2023.  The first amended complaint includes additional causes of action against Propco and others allegedly involved in the disputed transfer.

Plaintiff alleges Leissner had no authority to contract on its behalf.  Plaintiff alleges documents purporting to give Leissner such authority, on which Propco and others purportedly relied, were forgeries.  Plaintiff further contends that, even if authentic,

---

[2]     The loan agreement provided that a substantial portion of the loan proceeds were to be disbursed to Ghanim bin Saad Al Saad (Al Saad), an individual who is not a party to this litigation, with "Mr. Al Saad [required to] use $3,000,000.00 of the [l]oan proceeds towards funding the redevelopment" of certain property located in New York.  An email between associates of Simon, on which he was copied, characterized Al Saad as the "borrower" and "our tenant in . . . the . . . NYC property," and stated "$3m of these proceeds will be diverted to initiate that project."

these documents would not give Leissner authority to act on his own. Plaintiff also maintains, in any case, that the disputed transaction amounts to "an extension of the loan for one year as a disguised sale/lease back" that would allow Propco and Koronus (which have the same beneficial owners) to "evade foreclosure procedures." In this regard, plaintiff alleges the purported sale price was substantially below the Property's fair market value and, rather than Propco issuing the loan payoff amount to Koronus, the outstanding loan balance was "simply credited against the purported purchase price." Approximately $2.3 million in cash (the bulk of the difference between the sale price and the balance due on plaintiff's debt to Koronus) was wired to defendant Cantervale Limited (Cantervale), an entity owned by defendant Amanda Staveley (Staveley).[3] Neither Cantervale nor Staveley has any affiliation with plaintiff.

This appeal concerns only one of the several defendants named in the operative first amended complaint: Simon. Keyway alleges Simon and his brother, Reuben David Reuben (David), are the beneficial owners of Koronus and Propco, which function as their alter egos.

The first amended complaint alleges causes of action for quiet title and cancellation of instruments against Propco and Koronus; causes of action for a civil violation of Penal Code

---

[3] As quoted in the trial court's minute order denying Staveley's motion to quash, Staveley filed a declaration stating "part of the funds was repayment of . . . funds that [she] had advanced for the benefit of the borrower of the Koronus loan [(i.e., Keyway)]" after learning "Keyway had missed interest payments" and feeling "embarrassed as [she] had pitched the loan to Koronus."

4

section 496 (receiving stolen property), violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), and for declaratory relief against Propco, Koronus, the Reuben brothers, Cantervale, Staveley, and another entity;[4] and claims for breach of contract and gross negligence against Chicago Title Company (Chicago Title).

Propco filed a cross-complaint against plaintiff, Simmons, and Leissner.  The operative first amended cross-complaint alleges causes of action for unlawful detainer, quiet title, breach of contract, fraud, unjust enrichment, equitable lien, ejectment, trespass, and a common count for money had and received.

### B.    Simon's Motion to Quash

Simon and David filed a joint motion to quash Keyway's summons for lack of personal jurisdiction.  Simon and David are British citizens and longtime residents of Monaco.  They are the

---

[4]    The other defendant named in these causes of action, PCP Capital Partners LLP, allegedly furnished the forged operating agreement for plaintiff to the title company handling the disputed transaction.  With respect to the declaratory relief cause of action, plaintiff seeks a declaration that "a. Leissner was never authorized by Keyway [to] act on Keyway's behalf in connection with the [purchase and sale agreement], the [g]rant [d]eed, the [l]ease, and/or otherwise; [¶] b. [t]he purported sale of the Property to Propco and lease back to Keyway was actually a disguised loan transaction designed to enhance the [defendants'] security in the Property and charge an onerous, usurious rate of interest; [¶] c. Keyway has no obligation to pay claimed amounts constituting usurious loan interest; and [¶] d. Keyway has no obligation to repay amounts on the Koronus [l]oan that were not paid to Keyway upon funding of the loan by Koronus."

5

ultimate beneficial owners of both Koronus and Propco. Each filed a declaration stating he has never resided in California, does not own property in California, has never conducted personal or other business in California, and has never directly owned any businesses that are registered or incorporated in California. (Simon's declaration does acknowledge, however, that he once owned real property in Beverly Hills, which he sold in 1986.)

Simon and David argued they are not subject to either general or specific jurisdiction in California.[5] With respect to the latter theory, Simon and David argued their ownership of Propco is not sufficient to establish that they purposefully availed themselves of the benefits of doing business in California and there is no evidence that Propco is their alter ego. They further argued the dispute does not arise out of any contacts they might have with California and, in any case, it would be unreasonable for a California court to exercise jurisdiction over them.

In opposition, plaintiff argued California has specific jurisdiction over Simon and David because they "had *numerous* contacts with California in connection with the transactions at issue in the [first amended complaint]." Plaintiff principally relied on correspondence relating to the loan and disputed transfer.

With respect to the original loan, plaintiff cited a July 2018 email from James Reuben (James), a director at Reuben Brothers Limited, to Simon and others explaining the terms of the loan in broad strokes and noting "[o]ur security is a [four] [a]cre

---

[5] The brothers also argued Keyway had not served process on them. The trial court rejected this argument, and it is not at issue in this appeal.

6

residence in Beverly recently purchased for $25m . . . ."[6]  Simon replied the same day, emphasizing "[w]e need to ensure that we have control of rental agreement, if its being let.  In other words, we will need a very strong agreement to ensure that nothing can be done to reduce the value of the asset. . . ."

Plaintiff cited another July 2018 email from Alexander Bushaev (Bushaev), whose email domain is "@reubros.com," to Eileen Sawyer (Sawyer), a representative of a company called Motcomb Estates Limited, which plaintiff characterizes as a vehicle for Simon and David in the United Kingdom.  Bushaev asked Sawyer whether "RBL" (which Keyway surmises refers to "Reuben Brothers Limited") should "fund Koronus[.]"  A few days later, Sawyer wrote to someone named Sandrine (sreuben@libello.com), copying Simon, asking her to "arrange for Simon (on behalf of [an entity called] Landal) to sign [an] attached letter" needed "as part of the accounting for the Irish company" relating to the Koronus loan to Keyway.  Sandrine replied with a copy of a "subscription letter for shares" to Koronus's board of directors signed by Simon as a director "[f]or and on behalf of Landal Worldwide Corp."  (The appellate record does not provide any further information concerning Landal or its relationship to the entities involved in this litigation.)  The same day, Bushaev sent Simon an email asking him to "confirm [he was] OK with" the loan transaction.  The appellate record does not include any reply, but the loan closed on or about that day.

---

[6]     James's email signature block states "Reuben Brothers Limited is a Company registered in England and Wales . . . with its registered office" in London.  Plaintiff asserts, without citation to the record, that James is David's son and Simon's nephew.

About a year later, in July 2019, Sawyer sent Simon an email describing a one-year extension of the loan. Simon replied and asked, "Is the new loan for $12 m inc interest or is it an extension of a[n] older loan of $12 m inc interest[?]" When Sawyer explained "[i]t is an extension of the existing 12m loan," Simon answered, "Ok good. Thanks[.]"

In November 2020, around the time of the purported sale of the Property, Sawyer wrote to Bushaev, copying Simon, asking Bushaev to send approximately $2.8 million to Chicago Title "for the loan redemption and purchase of th[e] property." Simon replied, "Agreed." An attorney for Koronus and Propco provided copies of Simon and David's passports and utility bills to Chicago Title around the same time. When the transaction was completed, Sawyer wrote to Simon, "We have closed on the redemption of the Keyway loan/purchase of the [P]roperty."

Plaintiff argued these documents demonstrate Simon and David "approved" the Koronus loan and "oversaw and approved" the purported transfer of the Property. Plaintiff further argued the litigation arises from this California-directed activity because its "claims . . . are predicated on allegations that the [a]lleged [t]ransfer was an invalid disguised loan transaction." Plaintiff contended the exercise of personal jurisdiction over Simon and David would not be unreasonable because (among other things) they hired the same attorneys as the entity defendants they controlled, the claims against them and the entity defendants overlapped, the Property is in California, and plaintiff is a California entity.

In their reply in support of the motion to quash, Simon and David argued (among other things) that the emails on which plaintiff relied involved correspondents outside of California and,

8

in any case, emails sent to California would not amount to purposeful activity invoking the benefits of doing business in this state.

C.    *The Trial Court's Order*

The trial court ruled on Simon and David's motion to quash—along with motions to quash filed by Koronus, Staveley, and Cantervale—in July 2024.  The trial court granted Simon and David's motion to quash, but denied Koronus, Staveley, and Cantervale's motions.[7]

---

[7]    As to Staveley and Cantervale, the trial court determined Staveley "not only brokered, negotiated, and closed the loan, but also made several initial payments on the Koronus loan for Keyway, doing business in California, which was secured by a deed of trust against the subject California property," "authorized the closing of the sale on behalf of Propco, . . . and provided wire instructions for the sale proceeds to go to Cantervale."  As to Koronus, evidence that it and Propco have common ownership and Koronus "inexplicably wrote off the loan balance" as part of the sale demonstrated a "close nexus between the Koronus loan secured by . . . the subject California property[ ] and the ultimate, allegedly fraudulent transfer of the property to the Reuben [b]rothers' other[ ] California company, Propco."  Having found the litigation arises from Staveley, Cantervale, and Koronus's California-directed activity, the trial court further found that exercising jurisdiction over these defendants would be reasonable based on California's strong interest in adjudicating a dispute including a California company regarding real property in California, plaintiff's strong interest in convenient and effective relief in California, and because "judicial economy will be best served by adjudicating the dispute against all involved parties in one lawsuit."

9

In analyzing Simon and David's motion, the trial court started from the proposition that "[w]hether a forum may assume personal jurisdiction over . . . general partners is based upon assessing the general partners' forum contacts in their individual capacities as opposed to their forum contacts on behalf of the general partnership." After emphasizing the lack of correspondence involving David regarding either the loan or the purported sale, the trial court discussed the "several emails sent by or to Simon . . . ." The trial court read "the emails involving Simon [as] appear[ing] to be sent by or to Simon in his capacity as an agent of Koronus, and not in his individual capacity."

The trial court further reasoned that other evidence reflecting Simon and David's interest in the transaction—such as the provision of copies of their passports to Chicago Title—did not demonstrate purposeful availment in their individual capacities. Although "there [was] evidence in the record that Koronus and Propco may be alter egos of each other, there [was] no evidence that David or Simon are alter egos of Koronus and/or Propco."[8]

## II.  DISCUSSION

Plaintiff argues the trial court's analysis, especially its focus on whether Simon acted in his "individual capacity," is defective because it appears to rest on the fiduciary shield doctrine that is contrary to the weight of California authority. (See generally *Goehring v. Superior Court (Bernier)* (1998) 62 Cal.App.4th 894, 905-906; *Taylor-Rush v. Multitech Corp.* (1990)

---

[8]     Plaintiff noticed its appeal of the order granting Simon and David's motion to quash.  It subsequently requested, and this Court ordered, dismissal of the appeal as to David only.

10

217 Cal.App.3d 103, 115-118; see also *Calder v. Jones* (1984) 465 U.S. 783, 790 ["[defendants'] status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually"].) Perhaps, but we review the trial court's ruling, not its rationale. (*ParaFi Digital Opportunities LP v. Egorov* (2025) 108 Cal.App.5th 124, 135 ["on appeal from an order granting a motion to quash, the court's ruling 'must be affirmed even if "'given for a wrong reason'"'"].) As we shall discuss, with the fiduciary shield doctrine put to the side, Simon's minimal role in the loan and the disputed transfer still does not establish the requisite purposeful availment under either of the theories plaintiff advances, i.e., purposefully directing tortious conduct at California or deriving benefits from activity in California.

### A. General Principles of Personal Jurisdiction

California's long-arm statute (Code Civ. Proc., § 410.10) authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California. "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts. [Citation.] Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have 'certain minimum contacts . . . such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."' [Citation.]" (*Walden v. Fiore* (2014) 571 U.S. 277, 283, quoting *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316.)

11

There are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction. [Citation.]" (*Ford Motor Co. v. Montana Eighth Judicial District Court* (2021) 592 U.S. 351, 358.) "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State. [Citation.]" (*Ibid.*) There is no chance Simon is subject to general personal jurisdiction in California and plaintiff does not contend otherwise.

"Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.' [Citation.] The defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' [Citation.] The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' [Citation.] They must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285[ ] (2014) [using a contractual relationship that "'envisioned continuing and wide-reaching contacts' in the forum State" as an example of where jurisdiction would lie]. Yet even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum. [Citations.]" (*Ford, supra*, 592 U.S. at 359, bracketed insertion added.)

California courts commonly parse these principles into three elements. "A court may exercise specific jurisdiction over a

nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum'" [citation]; and (3) '"the assertion of personal jurisdiction would comport with 'fair play and substantial justice'"' [citation]." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.) "The plaintiff asking the forum state to exert jurisdiction over the out-of-state defendant bears the initial burden of establishing the first two elements by a preponderance of the evidence, and if the plaintiff does so, the out-of-state defendant then bears the burden of convincing the court why the exertion of personal jurisdiction would not comport with fair play and substantial justice." (*Jacqueline B. v. Rawls Law Group, P.C.* (2021) 68 Cal.App.5th 243, 253, italics omitted.)

### B. *Plaintiff Did Not Establish Purposeful Availment*

Simon may be subject to personal jurisdiction in California if he personally established the requisite minimum contacts with this state. (*Goehring*, *supra*, 62 Cal.App.4th at 905.) Koronus and Propco's contacts with California, however, are not necessarily attributed to Simon. (*Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 781, fn. 13 ["It does not of course follow from the fact that jurisdiction may be asserted over [a corporate defendant] that jurisdiction may also be asserted over either [its owner or holding company]"]; *Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 981 ["activities that are undertaken on behalf of a defendant may be attributed to that defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities toward the forum state"].) The analysis must focus on the defendant's individual

13

conduct. (*Keeton*, *supra*, at 781, fn. 13 ["Each defendant's contacts with the forum State must be assessed individually"].)

Plaintiff suggests Simon purposefully availed himself of forum benefits under two alternative tests: the "effects" test and the "forum benefits" test.[9] (See generally *Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1571 ["because California's long-arm statute "'manifests an intent to exercise the broadest possible jurisdiction'" [citation], its courts may apply the purposeful availment test most conducive to establishing specific jurisdiction over a defendant in a particular case, consistent with due process"].) Although the analyses overlap in some respects, we will discuss the problems with each separately.

### 1. The effects test

With respect to tort claims (such as those plaintiff asserts against Simon), courts generally apply a test derived from *Calder*, *supra*, 465 U.S. 783 that "requires intentional conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum." (*Pavlovich*, *supra*, 29 Cal.4th at 271, fn. omitted; accord *Strasner v. Touchstone Wireless Repair & Logistics, LP* (2016) 5 Cal.App.5th 215, 228 ["Under California

---

[9] Plaintiff's opening brief includes a separate heading for what it appears to regard as yet another test for purposeful availment based on Simon having "[c]reated an [o]ngoing [r]elationship between [plaintiff], [h]imself, and [forum] [r]esidents." Plaintiff, however, does not articulate any arguments in this section distinct from those relevant to the effects test and the forum benefits test.

14

law, to establish specific jurisdiction through the effects test a plaintiff must show the defendant committed an intentional act, expressly aimed at or targeting the forum state, with the knowledge that his act would cause harm in the state"].)  It is not enough that a defendant's actions harm a plaintiff with ties to the forum state: "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the "analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  (*Walden, supra*, 571 U.S. at 284-285.)

In *Calder* itself, for instance, a California resident sued a reporter and editor employed by the National Enquirer based on an allegedly libelous article published in the magazine.  (*Calder, supra*, 465 U.S. at 785-786.)  The article "concerned the California activities of a California resident . . . whose television career was centered in California," it "was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California."  (*Id.* at 788-789.)  Although the reporter and editor were "correct that their contacts with California are not to be judged according to their employer's activities" in California, they were "primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them [wa]s proper on that basis."  (*Id.* at 790.)

The situation here is obviously different: the evidence in the record does not establish Simon was a "primary participant" in either the loan or the disputed transfer.  Plaintiff offers no support for the assertion in its opening brief that "Simon intentionally and knowingly committed tortious acts toward a

15

California resident ([plaintiff], whose ultimate beneficial owner Simmons is also a California resident)" through his correspondence relating to the loan and the disputed transfer. Although it is clear Simon knew the Property is in California, that is essentially *all* that may be inferred from his handful of terse emails concerning the transactions at issue. There is no indication, for instance, that Simon proposed or negotiated either the loan or the purported transfer. His concern about the value of the collateral when the loan was issued in 2018 appears purely hypothetical, and his uncertainty about whether the 2019 extension was in fact a new loan, if anything, underscores his relative lack of attention to the matter. There is no evidence Simon knew plaintiff is a California LLC (much less the terms of its operating agreement), that Simmons lived at the Property, or that Simmons had any connection to plaintiff.[10] Although Simon is not insulated from personal jurisdiction by the fact that these transactions were conducted by entities he allegedly controls, we do not impute knowledge possessed by employees or representatives of these entities to Simon for jurisdictional purposes. (*Calder*, *supra*, 465 U.S. at 790 ["Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually"].)

---

[10] Indeed, as we have already noted in the margin, Simon was receiving emails characterizing Al Saad—with whom he and/or his organization apparently had a pre-existing relationship—as the borrower.

16

Plaintiff also compares this case to *Taylor-Rush*, in which the plaintiff sued several officers and directors of a company that acquired her business.  (*Taylor-Rush*, *supra*, 217 Cal.App.3d at 108.)  The Court of Appeal held two of these defendants—who personally "made fraudulent misrepresentations and nondisclosures" inducing the plaintiff to execute various agreements—were subject to personal jurisdiction in California, despite acting in a representative capacity, because their individual tortious conduct was purposely directed at a California resident and its effects were felt in the forum.  (*Id.* at 114.)

Simon's involvement in the loan and the disputed transfer does not compare to the conduct of the *Taylor-Rush* defendants subject to personal jurisdiction in California.  As we have already discussed, Simon's few short emails do not reflect any personal involvement in negotiating the transactions at issue or detailed knowledge of plaintiff's connections to California. (See *Taylor-Rush*, *supra*, 217 Cal.App.3d at 114 [holding, as to other defendant officers and directors who were not subject to jurisdiction, the evidence insufficiently established minimum contacts with California because, among other things, "their declarations clearly state[d] they did not participate in any of the negotiations during which [the plaintiff] claim[ed] she was defrauded"].)  Moreover, unlike the defendants in *Taylor-Rush*, there is no evidence that Simon had personal contact with any of plaintiff's representatives.

### 2.  *The forum benefits test*

"Under the forum benefits test, purposeful availment may be found where the defendant purposefully 'benefits in the forum by reaching out to forum residents to create an ongoing'

17

relationship. [Citations.]" (*ParaFi*, *supra*, 108 Cal.App.5th at 136; accord *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449-450.) As we have already discussed, however, a corporate defendant's purposeful availment of the benefits of doing business in a forum is not alone sufficient to subject its owners to personal jurisdiction. (*Keeton*, *supra*, 465 U.S. at 781, fn. 13; *Anglo Irish Bank*, *supra*, 165 Cal.App.4th at 981.)

To the extent plaintiff's reliance on forum benefits principles rests on an alter ego theory, plaintiff has not outright asserted—and we find no evidence in the record to conclude—that Koronus and Propco's corporate identities may be disregarded and their California contacts ascribed to Simon. (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 537-539 [discussing conditions required to pierce the corporate veil in personal jurisdiction context, including that "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist" and "there must be an inequitable result if the acts in question are treated as those of the corporation alone"].) There is nothing in the record, for instance, to suggest Simon commingled personal funds with those of the entity defendants, guaranteed their debts, or disregarded corporate formalities. (*Ibid.*)

Instead, relying chiefly on *Seagate Technology v. A.J. Kogyo Co.* (1990) 219 Cal.App.3d 696, plaintiff effectively rehashes the argument it advanced in the context of the *Calder* effects test. In *Seagate*, the plaintiff sued to recover funds owed by an entity that purchased computer components on credit. (*Id.* at 699-700.) The trial court granted a motion to quash filed by the president of

18

a separate Japanese entity who provided the plaintiff with a letter stating that entity "'guarantee[d] all credibility, responsibility, and liability of the action taken by'" the purchasing entity. (*Id.* at 700.) Applying the effects test, the Court of Appeal reversed the order granting the motion to quash. The reviewing court expressly rejected the notion that the individual defendant's role as an "investor" in the purchasing entity was sufficient to impute the purchasing entity's acts to him but found an effect in the forum state sufficient to confer personal jurisdiction based on "the extension of credit to [the purchaser] because of the guaranty issued by [the individual defendant] as president of both [the purchaser] and [the purported guarantor]."[11] (*Id.* at 704.)

Unlike the individual defendant in *Seagate*, who wrote a letter inducing the transactions at issue, Simon's personal involvement in the loan and purported transfer amounted to little more than approving actions taken by apparent associates or subordinates.[12] That is insufficient to confer jurisdiction.

_____

[11] The Court of Appeal did not discuss the financial benefits accruing to the Japanese entity's president until it reached the question of whether the exercise of jurisdiction over the individual defendant would comport with traditional notions of fair play and substantial justice. (*Seagate, supra,* 219 Cal.App.3d at 705.) It was in *that* context that the Court of Appeal emphasized the individual defendant was the purchaser's "major shareholder and had a real interest in its profits." (*Id.* at 706.)

[12] The record does not reveal the reason Chicago Title requested copies of Simon and David's passports and utility bills. (Their passport numbers and addresses are, however, listed in a "Currency Transaction Report" prepared by the title company.) In any case, there is no indication these documents factored into

19

(*Seagate, supra,* 219 Cal.App.3d at 704 ["no personal contact would result from doing nothing more than ratifying an act taken by the corporation or by another corporate officer"].)  And contrary to plaintiff's reading, *Seagate* does not stand for the proposition that a corporate entity's contacts are necessarily attributable to its owners in the context of a purposeful availment analysis.  As we have already explained, the purposeful availment analysis is focused on a defendant's personal conduct.  (*Goehring, supra,* 62 Cal.App.4th at 905.)

## DISPOSITION

The trial court's order is affirmed.  In the interests of justice, all parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.                    MOOR, J.

---

plaintiff's dealings with Simon or David in a manner analogous to the letter at issue in *Seagate*.